UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

ELIZABETH M. WATERS,                      :

                   Plaintiff,       :

          - against -                        :       **AMENDED COMPLAINT
                                            AND JURY DEMAND**

ANZ BANKING GROUP LTD.,                   :       05 Civ. 9567 (DC)

                 Defendant.       :
-----------------------------------------------------------x

        Plaintiff, Elizabeth M. Waters, by her attorneys Kraus & Zuchlewski

LLP, as and for her Complaint, alleges as follows:

## INTRODUCTION

    1.    Elizabeth M. Waters, a Director at the Australia and New Zealand Banking

Group Ltd. ("ANZ" or the "Bank") brings this retaliation action against ANZ.  Ms. Waters

alleges that, due to her having engaged in protected activity, she has been the object of adverse

action by being subjected to a negative change in the terms and conditions of her employment.

## JURISDICTION

    2.    This Court has jurisdiction pursuant to the Civil Rights Act of 1964, as

amended, 42 U.S.C. §2000e *et. seq.*, ("Title VII").  Jurisdiction as to the causes of action arising

under §296 of the New York Executive Law ("Executive Law") and Title 8, §8-107 of the

Administrative Code and Charter of the City of New York ("Administrative Code") is conferred

upon this Court by and under the principles of supplemental jurisdiction pursuant to 28 U.S.C.

§1367.

## VENUE

3.      The parties to this action reside in and/or regularly do business within the jurisdiction of the Court.  Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and ©, and 42 U.S.C. §2000e--5(f)(3).

## THE PARTIES

4.      Plaintiff Elizabeth M. Waters is a United States citizen and a resident of New York City.

5.      ANZ is a financial services institution based in Australia with an office and regular place of business located at 1177 Avenue of the Americas, New York, New York 10036.

## PROCEDURAL BACKGROUND

6.      On February 2, 2005, Plaintiff filed timely charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Defendants subjected her to retaliation for having engaged in protected activity.

7.      On August 31, 2005, the EEOC issued to Plaintiff a Notice of Right to Sue.

8.      In accordance with Title VII, §8-502 of the Administrative Code, Ms. Waters has served a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York.

## STATEMENT OF FACTS

9.      Ms. Waters has been employed by ANZ since October 1993.  She initially joined the Bank as a Credit Analyst.

2

10.    Ms. Waters's performance was consistently excellent, and in October 1995 she was promoted to Assistant Vice President. Two years later, she was promoted to Vice president, and in November 2000 she became a Director.

11.    In approximately January 1997, ANZ created an investment banking division and assigned Ms. Waters to work in it. She was made a Relationship Manager and, in June of that year, was assigned to work with Geoffrey Pack as a two-person team covering the Power Sector.

12.    Ms. Waters and Mr. Pack established a good working relationship, and as her experience and skills in structuring and relationship management increased, Mr. Pack came to increasingly rely upon her to carry out key management tasks.

13.    During 1999, Mr. Pack began to make romantic overtures to Ms. Waters. In addition to making frequent comments about her physical appearance, Mr. Pack engaged in periodic physical touching of Ms. Waters and told her repeatedly that he loved her. This behavior continued and grew more aggressive into 2000.

14.    Ms. Waters made clear to Mr. Pack that his conduct was unwelcome and that she would not tolerate it further.

15.    Thereafter, the relationship between Ms. Waters and Mr. Pack became strained and unpleasant. In May 2001, upper management divided between Ms. Waters and Mr. Pack the accounts on which they had previously worked together. Nonetheless, Ms. Waters and Mr. Pack still reported to the same superior, worked for the same sector, and sat adjacent to each other.

3

16.    In January 2001, Ms. Waters began seeing an Executive Coach, an arrangement which was initiated and paid for by the Bank.

17.    From the Spring of 2000 through Fall 2003, Ms. Waters's working relationship with Mr. Pack became increasingly untenable.  Although Mr. Pack had largely ceased his sexual harassment of Ms. Waters, he at times refused to speak to her, on other occasions attempted to dictate to her how she should run her business, and excluded her from meetings she was required to attend.

18.    During this period Ms. Waters approached her superior and Mr. Pack's supervisor, Head of Structured Finance, North America Scott McInnis, on several occasions about Mr. Pack's behavior.  Mr. McInnis advised her to work it out herself.

19.    Ms. Waters's Executive Coach told her that she should make friendly, positive overtures toward Mr. Pack, such as buying him gifts and offering to take him out for drinks.

20.    Despite her reservations, Ms. Water's followed the advice of her executive coach.  Mr. Pack responded by renewing his romantic overtures, forcing Ms. Waters to again make it clear to him that she did not wish to pursue a personal relationship.  Mr. Pack then became angry, again refusing to respond to Ms. Waters's e-mails and other business communications.

21.    In approximately May 2003, Peter Smith was assigned by ANZ to oversee all Relationship Managers in the United States and United Kingdom, including Ms. Waters and Mr. Pack.  Mr. Smith made Mr. Pack Team Leader for the Power Sector area.

4

22.    Ms. Waters again spoke to Mr. McInnis about her concerns regarding Mr. Pack, complaining that he did not interact with her in a professional manner and, despite the fact that he worked in a cubicle directly next to hers, had refused to speak to her for more than six weeks.  Perhaps because Mr. Smith and Mr. Pack had been on very friendly terms for a number of years, Mr. McInnis took no action.

23.    In March 2004, Ms. Waters met with senior managers Andrew Webster and Mr. McInnis and informed them that Mr. Pack had sexually harassed her.  In response, Ms. Waters was told that she was looking like a "problem" in front on her colleagues.

24.    During the last week of April 2004, Ms. Waters filed a formal complaint of sexual harassment with Mr. Webster, Head of People Capital (human resources) for ANZ's Wholesale Bank.  She further advised Mr. Webster that she could no longer work in the negative environment created by Mr. Pack's sexual harassment and later his open hostility toward her.

25.    No action was taken regarding Ms. Waters's complaint for approximately three weeks.  During this period, as she had previously, she continued to work in very close proximity to Mr. Pack and to attend meetings where he was present.

26.    Finally, Ms. Waters met with the Head of People Capital for ANZ's New York office, Terry Tablin.  Ms. Tablin reports to Mr. Webster, who is based in Australia.

27.    Following Ms. Water's conversation with Ms. Tablin, discussions ensued involving People Capital and Mr. McInnis regarding Ms. Waters's situation.

28.    In July 2004, ANZ advised Ms. Waters that she had three options and must select one if she wished to remain at the Bank.  Staying in her current position working with Mr. Pack was not among them.

5

29.     Two of the three alternatives were neither tenable nor realistic.

30.     The first involved relocating to Australia to work for Rob Spee, ANZ's Head of Utilities and Infrastructure.  Not only was this position ill-defined, in that no specific details regarding what her duties would be were even provided to Ms. Waters, but it required Ms. Waters to leave behind family and friends and move halfway around the world to take a job she had no information about.

31.     The second alternative was to become Co-Head of the Resources Sector with Director Peter Gray.  Ms. Waters explored this option and was able to quickly determine that it was no more viable than the first.  Mr. Gray made clear that he did not want someone working with him and that if Ms. Waters joined his sector, she would not in practice be Co-Head at all.  Rather, he would continue to develop strategy and perform all other significant responsibilities while Ms. Waters handled day-to-day matters.

32.     In addition, Ms. Waters's role in the Resources Sector would have focused on the Oil & Gas sub-segment, an area that the Bank was not supporting in the United States, and that was already being covered by another marketing person.  Ms. Waters would thus have had to share coverage of a secondary area with relatively little business as opposed to managing her own portfolio, as she had for some time.  The Resources Sector alternative was clearly a demotion that would in all likelihood have derailed Ms. Waters's career.

33.     Therefore, as a practical matter ANZ presented Ms. Waters with only one even arguably plausible choice: a transfer to a position where she would be covering the Telecom, Media and Entertainment Sector.

34.     Upon information and belief, ANZ realized that the first and second of its three alternatives were not viable, and that as a practical matter the transfer to Telecom, Media and Entertainment was the only course open to Ms. Waters if she wished to remain employed.

35.     Ms. Waters had serious reservations about the transfer to Telecom, Media and Entertainment.  Earlier in 2004 the Bank had determined that there was insufficient business in this area to justify a marketing officer/Director covering it.  Apparently because of this assessment, the Bank had dismissed the prior head of Telecom, Media and Entertainment due to a lack of business.

36.     ANZ assured Ms. Waters that business opportunities existed in the Telecom, Media and Entertainment area.  Lacking any alternative, Ms. Waters accepted the transfer and attempted to be as positive as she could about it by stating to Ms. Tablin that there appeared to be "some very interesting opportunities in that sector," though she advised Ms. Tablin that the position required support to be viable.

37.     Although the transfer represented the Bank's response to Ms. Waters's complaint of sexual harassment, ANZ refused to provide her with a written statement or letter reflecting its actions or addressing the issue of how it responded to her sexual harassment complaint.

38.     Soon after she assumed her new position, Ms. Waters realized that it was not an area where the Bank could perform well.  Among other things, ANZ failed to provide the support necessary for Ms. Waters to achieve any results in the new position, including declining to pursue three possible deals that she wished to develop.

39.     Ms. Waters not only lacked the support and commitment that she required from ANZ to function in a meaningful fashion in the Telecom, Media and Entertainment job, but did not even have enough work to do to keep her occupied.

40.     In September 2004, Ms. Waters complained to Ms. Tablin about the extremely poor prospects in her new position and told her that she was very unhappy.  Several months later, she advised Mr. McInnis and Mr. Smith that there was no business for her in her sector and that she was being underutilized.

41.     Since the transfer, Ms. Waters's bonuses have diminished substantially, leading to a reduction in her compensation.

42.     Ms. Waters's transfer led to a markedly negative change in the terms and conditions of her employment, and was undertaken in retaliation for her sexual harassment complaint.

43.     In October 2004, ANZ promised Ms. Waters the opportunity to take responsibility for the transportation sector.  Two months later, however, the offer was withdrawn and the Transportation Sector assignment given to a junior relationship manager.

44.     Despite the significant limitations of her new position, Ms. Waters was able to use her relationship with the Walt Disney Company ("Disney") to win two major deals for the Bank in 2005, both of which were UK leasing deals on Disney films.  These transactions alone earned "up front" fees for ANZ of $1.86 million.

45.     On November 14, 2005, Ms. Waters commenced this action in U.S. District Court.

8

46.    During the first week of December, 2005, Ms. Waters was told that her bonus for the fiscal year ending in September 2005 would be $46,000. This figure represents the lowest bonus Ms. Waters has received in seven years.

47.    Upon information and belief, Ms. Waters's colleague Christine Higgins received a much higher bonus than did she. Ms. Higgins was told that her bonus and ranking were largely a result of her work on the two Disney UK leasing transactions which Ms. Waters was primarily responsible for winning.

48.    Ms. Waters has remained in the position she was transferred to in 2004, and continues to endure significant stress and hostile, highly unsatisfactory working conditions. Among other things, her desk continues to be located near Mr. Pack, with whom she is in ongoing contact.

49.    As a result of Defendant's retaliation against Ms. Waters for opposing an unlawful employment practices, Ms. Waters suffered monetary damage, injury to her reputation and emotional distress, and has lost professional opportunities.

## PLAINTIFF'S FIRST CAUSE OF ACTION

50.    Plaintiff repeats each and every allegation contained in paragraphs 1 through 45 inclusive as though fully set forth herein.

51.    Defendant, by transferring Plaintiff to the Telecom, Media and Entertainment sector in response to her complaint, willfully retaliated against Plaintiff for opposing unlawful employment practices in violation of Title VII.

## PLAINTIFF'S SECOND CAUSE OF ACTION

52.    Plaintiff repeats each and every allegation contained in paragraphs 1 through 45 inclusive as though fully set forth herein.

53.    Defendant, by transferring Plaintiff to the Telecom, Media and Entertainment sector in response to her complaint, willfully retaliated against Plaintiff for opposing unlawful employment practices in violation of §296 *et. seq.* of the Executive Law.

## PLAINTIFF'S THIRD CAUSE OF ACTION

54.    Plaintiff repeats each and every allegation contained in paragraphs 1 through 45 inclusive as though fully set forth herein.

55.    Defendant, by transferring Plaintiff to the Telecom, Media and Entertainment sector in response to her complaint, willfully retaliated against Plaintiff for opposing unlawful employment practices in violation of §8-01 *et. seq.* of the Administrative Code.

## PLAINTIFF'S FOURTH CAUSE OF ACTION

56.    Plaintiff repeats each and every allegation contained in paragraphs 1 through 45 inclusive as though fully set forth herein.

57.    Defendant, by paying Plaintiff a much lower bonus for the 2004-05 fiscal year than her performance warranted in response to her initiating a lawsuit against it, willfully retaliated against Plaintiff for opposing unlawful employment practices in violation of Title VII.

## PLAINTIFF'S FIFTH CAUSE OF ACTION

58.    Plaintiff repeats each and every allegation contained in paragraphs 1 through 45 inclusive as though fully set forth herein.

10

59.    Defendant, by paying Plaintiff a much lower bonus for the 2004-05 fiscal year than her performance warranted in response to her initiating a lawsuit against it, willfully retaliated against Plaintiff for opposing unlawful employment practices in violation of §296 *et. seq.* of the Executive Law.

## PLAINTIFF'S SIXTH CAUSE OF ACTION

60.    Plaintiff repeats each and every allegation contained in paragraphs 1 through 45 inclusive as though fully set forth herein.

61.    Defendant, by paying Plaintiff a much lower bonus for the 2004-05 fiscal year than her performance warranted in response to her initiating a lawsuit against it, willfully retaliated against Plaintiff for opposing unlawful employment practices in violation of §8-01 *et. seq.* of the Administrative Code.

## JURY DEMAND

62.    Plaintiff demands trial by jury on all counts.

**WHEREFORE**, Ms. Waters respectfully prays that this Court:

63.    Issue a declaratory judgment that the acts and practices complained of herein are in violation of Title VII, the New York State Executive Law, and §8-01 *et seq.* of the New York City Administrative Code;

64.    Order Defendant to make Plaintiff whole by providing appropriate back pay and front pay in an amount to be shown at trial;

65.    Grant judgment to Plaintiff and against Defendant for mental distress and pain and suffering experienced by Plaintiff in an amount to be shown at trial;

11

66.    Grant judgment to Plaintiff and against Defendant of punitive and exemplary damages in an amount to be shown at trial;

67.    Grant to Plaintiff her attorney's fees, costs, disbursements, and interest;

68.    Retain jurisdiction over this action until Defendant fully has complied with the orders of this Court, and require it to file such reports as the Court deems necessary to evaluate such compliance; and

69.    Grant such further and additional relief as may to this Court seem just and proper.

Dated: New York, New York
       December 6, 2005

                                        KRAUS & ZUCHLEWSKI LLP


                        By:    _____
                                Geoffrey A. Mort (GM5254)
                                Attorneys for Plaintiff
                                    Elizabeth M. Waters
                                500 Fifth Avenue, Suite 5100
                                New York, New York 10110-5197
                                (212) 869-4646